| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ALABAMA CENTER FOR SUSTAINABLE ENERGY d/b/a ENERGY ALABAMA, APPALACHIAN VOICES, SOLAR UNITED NEIGHBORS, SOUTHERN ALLIANCE FOR CLEAN ENERGY, and SOWING JUSTICE, <br><br> Plaintiffs, <br> v. <br><br> TENNESSEE VALLEY AUTHORITY, <br><br> Defendant. | Civil Action No.:_____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     This suit challenges the Tennessee Valley Authority's ("TVA") response to a Rulemaking Petition seeking to restrict TVA's regular payments to third-party groups— including trade associations and industry groups—that work against the interests of TVA ratepayers. TVA provides millions of dollars to groups fighting against the protection of human health, wildlife, and the environment. Concerned that this spending contravenes both TVA's statutory mission and TVA ratepayers' First Amendment rights, more than a year-and-a-half ago a coalition of organizations (hereafter "Petitioners") submitted a formal Rulemaking Petition to TVA.

2.     The Petition extensively documents both these third-party organizations' activities and TVA's financial support for them. For example, it details that many of these groups support political organizations and regularly lobby on issues that undermine the health and safety of

1

TVA ratepayers. Other groups, such as the "Utility Water Act Group," regularly oppose environmental protections in courts and before agencies. TVA collectively pays these groups millions of dollars collected from TVA ratepayers through electricity sales.

3.    The Petition presents two separate rationales for TVA to curtail this spending. First, Petitioners argue that TVA's support for these groups contravenes its Congressional mandate to protect the health and welfare of the millions of people TVA serves and the environment in which they live. Second, the Petition argues that using TVA ratepayers' funds to support political activities contravenes ratepayers' First Amendment right against compelled subsidy of speech with which ratepayers disagree. Finally, the Petition proposes specific amendments to TVA's regulations to address these payments.

4.    On May 21, 2020, TVA responded to the Petition by simply asserting that TVA's funding for these third-party groups is appropriate, without at all responding to the substantial evidence and specific arguments included in the Petition, or even indicating that the Petition was being denied.

5.    The Administrative Procedure Act ("APA") requires a federal agency to respond to a Rulemaking Petition by explaining the bases for its decision based on the information presented to it. 5 U.S.C. § 555(e). Because TVA's May 21, 2020 letter neither addressed the evidence presented to TVA, nor responded to the arguments in the Petition, TVA's response is arbitrary and capricious, in violation of the APA. *Id.* §§ 555(e); 706(2)(A).

6.    The APA also requires an agency to conclude a matter presented to it within a reasonable time. *Id.* § 555(b). Since TVA has neither granted nor denied the Rulemaking Petition, the agency's inaction constitutes agency action unreasonably delayed, in violation of the APA. *Id.* § 706(1).

7. Accordingly, by this action, Plaintiffs seek appropriate relief directing TVA to provide a legally sufficient response to the Rulemaking Petition within thirty (30) days.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202

9. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e)(1), as TVA's headquarters are in this district, and TVA's response to the Petition was prepared in this district.

## PARTIES

10. Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit conservation organization with offices throughout the United States, including in the Southeast. The Center has more than 1.7 million members and online activists who care about the country's urgent need to expedite the renewable energy transition and protecting human health, the natural environment, and species from the ravages of the climate emergency and environmental degradation. The Center's Energy Justice Program focuses on environmental and energy justice in the new renewable energy system, and specifically fights to decarbonize the utility sector— including TVA—and to combat utilities' use of ratepayer dollars to undermine environmental protections and renewable energy.

11. The Center brings this action on its own institutional behalf and on behalf of its members, more than 600 of whom are TVA ratepayers. This includes the Center's more than 500 members who live in Tennessee. By failing to provide a meaningful response to the Petition, submitted by the Center, TVA is injuring the Center by denying information to which the Center is statutorily entitled. TVA is also injuring Center members who are TVA ratepayers by forcing them to fund third-party groups engaged in activities they do not support. For example, Center

3

members John Nolt, Douglas Finnan, Brandon Beavers, Paul Berney, Christopher Scott Irwin, and Vic Scoggin are TVA ratepayers who object to this TVA spending, paying their electricity bills to TVA power companies. These members are injured by the charges that provide funding to these third party groups, and these injuries to the Center and its members would be redressed if TVA were to grant the Rulemaking Petition.

12. Plaintiff Alabama Center for Sustainable Energy (*dba* Energy Alabama) is a statewide, non-profit organization advocating for the transition to sustainable energy in Alabama. Energy Alabama has more than 2,000 members and online activists, including TVA ratepayers. Energy Alabama works to accelerate the transition to sustainable energy through public education at all levels, advocacy for just energy policy, and the provision of technical assistance to those working to improve the energy performance of their homes and businesses. This includes combatting utility reliance on ratepayer funding that allows third parties to work against environmental protections and the just transition to clean energy.

13. Energy Alabama brings this action on its own institutional behalf and on behalf of its members, more than fifty of whom are TVA ratepayers. By failing to provide a meaningful response to the Petition, submitted by Energy Alabama, TVA is injuring Energy Alabama by denying information to which the organization is statutorily entitled. TVA is also injuring Energy Alabama members who are TVA ratepayers by forcing them to fund third-party groups engaged in activities they do not support. For example, Energy Alabama members Randy Buckner, Jonathan Rossow, Richard Williams and Daniel Tait are TVA ratepayers who object to this TVA spending, paying their electricity bills to TVA power companies. These members are injured by the charges that provide funding to these third party groups, and these injuries to Energy Alabama and its members would be redressed if TVA were to grant the Rulemaking Petition.

4

14.     Plaintiff Appalachian Voices is a 501(c)(3) non-profit organization working to bring people together to protect the land, air, and water of Central and Southern Appalachia, and to advance a just transition to a generative and equitable clean energy economy. Appalachian Voices has over 1,100 members throughout the country, including more than seventy (70) in Tennessee and other states who are TVA ratepayers.  Through public comments, education, communication initiatives, and the provision of resources and data to electric cooperatives, Appalachian Voices works collaboratively with local, state, and regional partners to promote energy efficiency and encourage the development of clean and affordable energy. This includes combatting utility reliance on ratepayer funding that allows third parties to work against environmental protections and the just transition to clean energy.

15.     Appalachian Voices brings this action on its own institutional behalf and on behalf of its members. By failing to provide a meaningful response to the Petition, submitted by the Appalachian Voices, TVA is injuring  Appalachian Voices by denying information to which the organization is statutorily entitled. TVA is also injuring Appalachian Voices members who are TVA ratepayers by forcing them to fund third-party groups engaged in activities they do not support. For example, Appalachian Voices members JoAnn McIntosh and Brady Watson are TVA ratepayers who object to this TVA spending, paying their electricity bills to TVA power companies. These members are injured by the charges that provide funding to these third party groups, and these injuries to Appalachian Voices and its members would be redressed if TVA were to grant the Rulemaking Petition.

16.     Plaintiff Solar United Neighbors ("SUN") is a national 501(c)(3) nonprofit organization headquartered in Washington, DC. SUN has more than 8,500 members, including more than in 50 Tennessee, including TVA ratepayers. SUN works to support the needs and

interests of solar owners and supporters across the country. This includes combatting utility reliance on ratepayer funding that allows third parties to work against environmental protections and the just transition to clean energy.

17.     SUN brings this action on its own institutional behalf and on behalf of its members. By failing to provide a meaningful response to the Rulemaking Petition, submitted by SUN, TVA is injuring SUN by denying information to which the organization is statutorily entitled. TVA is also injuring SUN members who are TVA ratepayers and who object to this TVA spending, by forcing them to fund third-party groups engaged in activities they do not support. These members are injured by the charges that provide funding to these third party groups, and these injuries to SUN and its members would be redressed if TVA were to grant the Rulemaking Petition.

18.     Plaintiff Southern Alliance for Clean Energy ("SACE") is a non-profit organization that promotes responsible and equitable energy choices that work to address the impacts of global climate change and ensure clean, safe and healthy communities throughout the Southeast. After more than 30 years, SACE remains the only regional organization solely focused on transforming the way we produce and consume energy in the Southeast. SACE has more than 15,000 members and online activists in the states served by TVA who are concerned about reducing emissions that contribute to extreme weather from climate change; creating jobs and economic development in the clean energy sector; and reducing electric bills burden through effective efficiency programs. This includes combatting utility reliance on ratepayer funding that allows third parties to work against environmental protections and the just transition to clean energy.

6

19.     SACE brings this action on its own institutional behalf and on behalf of its more than 850 members and over 26,000 supporters who live in the Tennessee. TVA is injuring SACE members who are TVA ratepayers, because they are forced to fund outside groups engaged in activities they do not support. For example, SACE members Frances Lamberts, Kent Minault, and Wolf Naegeli are TVA ratepayers who object to this TVA spending, paying their electricity bills to TVA power companies. These members are injured by the charges that provide funding to these outside groups, and these injuries to SACE and its members would be redressed if TVA were to grant the Rulemaking Petition.

20.     Plaintiff Sowing Justice is a nonpartisan nonprofit organization relying on citizen science and environmental justice principles to increase civic engagement among fence line polluted communities in Tennessee. Based in Memphis, Sowing Justice connects communities with organizing tools and resources to empower engagement with local, state, and federal policies that foster healthy and safe communities where people live, learn, work, worship, and recreate. Sowing Justice has thousands of supporters throughout Tennessee, and is managed by a Board of Directors, all of whom are committed to addressing the disparate impacts of fossil fuel power plants on frontline communities and the urgent need for a just transition to clean energy, and are concerned about TVA reliance on ratepayer funding that allows third party organizations to fight environmental protections.

21.     Sowing Justice brings this action on its own institutional behalf and on behalf of its supporters and Board members, many of whom are TVA ratepayers. TVA is injuring Sowing Justice, its supporters, and its Board members who are TVA ratepayers by forcing them to fund third-party groups engaged in activities they do not support. For example, Sowing Justice Board members Kermit Moore Jr., Doris Deberry Bradshaw, Moriesha Doby, Anthony Moore, and

Erica Owen are TVA ratepayers who object to this TVA spending, paying their electricity bills to TVA power companies. These members are injured by the charges that provide funding to these third party groups, and these injuries would be redressed if TVA were to grant the Rulemaking Petition.

22.     Defendant Tennessee Valley Authority is an agency of the United States, created by and existing pursuant to the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831, *et seq.*, *as amended.* ("TVA Act"). Pursuant to 5 U.S.C. § 701(b)(1), TVA is subject to the Administrative Procedures Act ("APA), 5 U.S.C. § 701, *et. seq.*

## THE ADMINISTRATIVE PROCEDURE ACT.

23.     Congress enacted the APA to provide a basic framework for agency procedures, including judicial review of agency decision-making. 5 U.S.C. Part 1. Under the APA, an agency submits proposed regulations for public comment, and then issues final regulations. 5 U.S.C. § 553.

24.     The APA also provides that each agency "shall give an interested person the right to petition for the issuance" of a regulation. *Id.* § 553(e).

25.     When an agency decides to deny such a petition, the APA requires that the agency provide notice of the denial and a reasonable explanation for the agency's decision. 5 U.S.C. §§ 555(e); 706(2).

26.     The APA also requires an agency to resolve such a petition within a reasonable time. 5 U.S.C. §§ 555(b); 706(1).

27.     The TVA is a federal agency covered by the APA. 5 U.S.C. § 701(b).

8

**A.     The Tennessee Valley Authority**

28.     Congress created the TVA in 1933, directing the agency to, *inter alia*, generate and sell electricity. 16 U.S.C. § 831i. The TVA Act gives the TVA control over how it sells electricity, either directly to customers or through other entities that distribute TVA power to end-use customers, and serve as payment collectors on TVA's behalf. *Id.*

29.     Today, TVA is the nation's largest public power provider. It generates electricity for most of Tennessee, northern Alabama, northeastern Mississippi, and southwestern Kentucky, as well as portions of northern Georgia, western North Carolina, and southwestern Virginia.

30.     TVA provides approximately 9.7 million people with electricity, largely through electricity sales to Local Power Companies ("LPCs"), who sell TVA's power to retail customers on behalf of TVA. TVA has wholesale power contracts with approximately 154 LPCs, and TVA specifies the rates at which the LPCs must sell TVA power.

31.     While most federal agencies are funded by taxpayers, TVA does not receive taxpayer funding, but instead generates its revenue by selling electricity.

**B.     Petitioners' February, 2020 Rulemaking Petition**

32.     On February 20, 2020, Petitioners submitted to TVA a formal Rulemaking Petition pursuant to the APA. TVA received the Petition by email and overnight mail on or before February 21, 2020.

33.     The Petition provides eight pages of detail regarding the lobbying and other advocacy activities of third-party groups financially supported by TVA. In addition to discussing the lobbying and other advocacy activities of trade associations like the Edison Electric Institute ("EEI") and the Nuclear Energy Institute ("NEI"), the Petition also details the work of additional

third-party groups—such as the Utility Water Act Group—that regularly engage in judicial and administrative advocacy opposing environmental protections. The Petition also details TVA's long-standing payments to these groups, and includes invoices showing millions of dollars in payments over several years.

34.     Following that background, the Petition sets forth two detailed arguments in support of the regulations sought by Petitioners. The Petition explains that, given these third-party groups' controversial activities, TVA's financial support contravenes both TVA's statutory mission and ratepayers' First Amendment rights.

35.     Finally, to remedy these legal concerns, the Petition includes new specific proposed regulations for TVA. As relevant here, Petitioners proposed that TVA add to 18 C.F.R. § 1315.100 the following new subsection:

> (f)     No TVA funds may be:
> ***
>     (ii)     paid to a third party organization that either:
>         (A)     engages in litigation related to agency regulations or other governmental activities; or
>         (B)     influences or attempts to influence legislative or executive action, including policy research to support such efforts; or
>         (C)     makes political contributions.

### i.     The Controversial Political Advocacy Conducted By Groups That Receive TVA Funding

36.     The Edison Electric Institute ("EEI") is the leading trade association for electric utilities. As invoices included in Attachment 9 of the Petition show, since at least 2015 TVA has been an EEI Strategic Partner, paying at least $500,000 annually to support EEI's work, adding up to millions of dollars.

37.     The Petition relies on public filings to document that EEI regularly engages in lobbying and other political activities, including funding political organizations.

10

38.     As Attachment 5 submitted with the Petition shows, in 2015 EEI published a "Results in Review" summarizing some of its activities. These activities included supporting legislation to "[r]epeal the ban on the use of fossil-fueled energy in federal buildings"; "advocat[ing] that any new ozone standard should be at the top end of the proposed range"; "promot[ing] a study highlighting the economic and environmental benefits of utility-scale solar compared to rooftop solar"; and advocating "for a reduction in aggregate rate subsidies" for rooftop solar. Under "Environmental Policy Activities," EEI also highlighted its work with other groups—including the Utility Water Act Group—to challenge the U.S. Environmental Protection Agency's ("EPA") regulatory initiatives designed to protect human health and the environment.

39.     As Attachment 6 submitted with the Petition shows, in 2016 EEI published another "Results in Review" summarizing some of its activities, including "advocat[ing] against change to the [Securities and Exchange Commission climate change] disclosure rules"; "secur[ing] language in legislation reauthorizing the Toxic Substances Control Act that achieves the industry's goals of preserving existing regulation"; working with the American Gas Association and the Nuclear Energy Institute to "drive the conversation about our nation's energy future during the Republican and Democratic National Conventions";  and "work[ing] to rebalance the conversation" on net energy metering both "through extensive earned media efforts," and by "advocat[ing] for a reduction in aggregate rate subsidies for DG [Distributed Generation] solar." As the Petition explains, net energy metering encourages business and homeowner rooftop solar projects by  providing retail compensation for a generator's excess electricity during daylight hours. The Petition also provides additional details concerning EEI's controversial advocacy against net metering—which, unlike utility-owned solar projects, does

11

not provide profits to EEI's utility members like TVA. *See, e.g.,* Joby Warrick, *Utilities wage campaign against rooftop solar*, Wash. Post, Mar, 7, 2015.

40.     The Nuclear Energy Institute ("NEI") is the leading trade association for utilities operating nuclear power plants. As invoices included in Attachment 11 of the Petition show, TVA pays NEI annually. However, in response to a request under the Freedom of Information Act, 5 U.S.C. § 552, TVA redacted the amount of these payments, claiming they are somehow exempt from disclosure.

41.     NEI advocates in favor of nuclear power, which the U.S. Supreme Court has characterized as a "controversial issue" of public policy in light of its safety issues. *Consolidated Edison Co. v. Pub. Svc. Comm'n of New York*, 447 U.S. 530, 535 (1980). For example, as the Petition discusses, in 2019, NEI supported Ohio Bill 6, which subsidized nuclear plants and has been the subject of substantial public controversy.

42.     The Petition also relies on public filings to document NEI's substantial lobbying activities, as well as its donations to political action committees.

43.     The Utility Regulatory Groups ("URGs")—Utility Air Regulatory Group ("UARG"), Utility Water Act Group ("UWAG"), and Utility Solid Waste Activities Group ("USWAG")—are anti-regulatory advocacy groups. As reflected in invoices included in Attachments 7, 10, 12, and 14 submitted with the Petition, TVA has paid these groups millions of dollars for their advocacy work. Some of these invoices reflect that the payments are at least partially for "influencing legislation."

44.     As the Petition details, these groups have engaged in hundreds of regulatory matters, including lawsuits challenging clean air and public health standards and objecting to regulations designed to protect human health and the environment. The URGs have been

involved in cases and regulatory proceedings objecting to the EPA's authority to regulate greenhouse gas emissions; opposing specific greenhouse gas emission regulations; objecting to EPA's limits on toxic wastewater discharges from power plants; and criticizing an EPA regulation—promulgated partly in response to a toxic TVA spill—designed to ensure safe disposal of coal ash from power plants.

45.     The Energy and Wildlife Action Coalition ("EWAC") is also an anti-regulatory advocacy group. As reflected in invoices included in Attachment 13 submitted with the Petition, TVA has paid EWAC hundreds of thousands of dollars for its advocacy work. Some of these invoices reflect that the payments are at least partially for "influencing legislation."

46.     As the Petition details, EWAC routinely engages in advocacy opposing environmental regulations intended to protect wildlife. This has included opposing protections for migratory birds; supporting litigation challenging protections for eagles; and advocating for weakening the existing protections for endangered species.

### ii.     Petitioners' Bases For TVA To Amend Its Regulations Governing Payments To These Organizations

47.     Given this factual record, the Petition makes two separate legal arguments for TVA to adopt Petitioners' proposed regulations, which would preclude TVA from financially supporting utility trade groups and their affiliates. First, Petitioners argue that TVA's support for these groups is contrary to the TVA Act. Second, Petitioners argue that TVA ratepayers—who include Petitioners' members in TVA service territory—have a constitutional right to not be forced to subsidize these groups, which are engaged in activities contrary to these members' values and interests.

13

###### a.    The Petition's Argument That TVA Is Acting Contrary To The TVA Act By Funding Third-Party Trade Groups

48.    The Petition first argues that, given the activities of utility trade groups and their affiliates, TVA's ongoing financial support is contrary to the agency's Congressional mandate.

49.    The Petition explains that the TVA Act requires TVA to use its electricity rate-making power to not only provide electricity, but also to address the "environmental, social, [and] physical well-being of the people" living, working and recreating in the area. 16 U.S.C. § 831a(g)(1)(K)(ii). The Act also provides that part of the agency's mission is to be a national leader in environmental stewardship. *Id.* § 831a(b)(5).

50.    The Petition next explains that TVA's financial support for groups like EEI, NEI and the URGs contravenes these mandates. For example, the Petition summarizes, these groups have advocated for delaying EPA's regulation of toxic pollution generated by fossil fuel power plants, including those owned by TVA, which is contrary to the agency's environmental protection mission. Similarly, the Petition argues, it is contrary to TVA's mission for the agency to support third-party groups opposing EPA efforts to regulate greenhouse gas emissions, given that climate change threatens the "physical well-being" of the very communities Congress directed TVA to serve. Finally, the Petition highlights how these groups actively work against the clean energy transition, which also runs contrary to TVA's environmental stewardship mandate.

51.    For all these reasons, the Petition urges TVA to promulgate the proposed regulations, which would end TVA's financial support—and by extension, the revenue collected from TVA ratepayers—for these groups.

b. **The Petition's Argument That TVA Is Compromising TVA Ratepayers' First Amendment Rights By Funding These Third party Groups**

52. The Petition next argues that TVA's use of ratepayer dollars to support third-party political advocacy raises serious First Amendment concerns, which the proposed regulations would resolve.

53. The Petition explains that the Supreme Court has recognized that charging ratepayers for a utility's political activities implicates the First Amendment. *Consolidated Edison Co. v. Pub. Svc. Comm'n of New York*, 447 U.S. 530 (1980).

54. The Petition also explains that, more recently, the Supreme Court has concluded that compelled payments to an organization engaged in political activities raises serious First Amendment concerns, regardless of how the payments themselves are used. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463-64 (2018).

55. The Petition explains that there are TVA ratepayers who are members of Petitioners' organizations and object to having any part of their utility payments used to fund third-party advocacy that they do not support. This includes the activities of groups like EEI, NEI, the URGs, and EWAC, all of which advocate against regulatory initiatives designed to protect public health, wildlife and the environment.

56. Given these objections, and the Supreme Court's First Amendment jurisprudence, the Petition argues that TVA should promulgate the regulations proposed by Petitioners in order to safeguard TVA ratepayers' First Amendment rights. By prohibiting TVA from funding third party organizations that lobby, influence legislation, make political contributions, and litigate and advocate against human health, wildlife and environmental protections, the proposed regulations

15

would protect TVA ratepayers from being compelled to fund organizations engaged in controversial and political activities that they do not support.

**C.     TVA's Failure To Meaningfully Respond To The Rulemaking Petition.**

57.     More than eighteen months after receiving the Rulemaking Petition, TVA has neither informed Petitioners that it is still considering the Petition, nor announced that it has concluded its consideration of the matter Petitioners presented to the agency.

58.     Instead, on May 21, 2020 TVA's Director of Environment and Energy Policy sent a letter to Petitioners (hereafter "TVA May 21, 2020 Letter" or "TVA's Letter"). TVA's letter did not refer to the Petition.

59.      Rather, TVA's Letter simply stated that "TVA works with a variety of organizations to fulfill its mission and comply with its legal responsibilities," including "trade associations" and "industry groups."

60.     TVA's Letter further claimed that TVA's "participation in groups where best practices, knowledge, and tools are collectively developed and shared is the only responsible course of action, both operationally and fiscally," and that while this "participation involves some expense, this expense is more than made up by the savings arising from TVA not duplicating the same research and analysis on its own or from profit-driven contractors."

61.     TVA's Letter did not state that Petitioners' Rulemaking Petition was being denied.

62.     TVA's letter did not state that TVA is still considering the Rulemaking Petition.

63.     TVA's letter did not discuss the lobbying or other advocacy activities performed by the third-party groups that TVA supports, which the Rulemaking Petition addressed in detail.

16

Instead, TVA's letter only discussed these third-party groups' "research and analysis" services—which the Rulemaking Petition does not address.

64.     TVA's letter did not deny that, in addition to their research and analysis work, these third party organizations regularly engage in lobbying, political contributions, and other advocacy activities—including opposing regulatory and other initiatives intended to protect human health, wildlife, and the environment.

65.     TVA's letter did not explain how TVA's financial support to groups engaged in these activities is consistent with TVA's Congressional mandates under the TVA Act.

66.     TVA's letter acknowledges that "TVA ratepayers have the right to express their views and support preferred causes." However, the letter did not explain how TVA's use of TVA ratepayers' funds to support trade associations and other third party groups engaged in lobbying and other advocacy activities that TVA ratepayers do not support is consistent with TVA ratepayers' First Amendment rights.

67.     Petitioners have not received any further communication on this subject from TVA since TVA's May 21, 2020 letter.

### PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(arbitrary and capricious agency action)

68.     Plaintiffs hereby incorporate by reference Paragraphs 1-67 above.

69.     The APA requires that an agency denying a rulemaking petition provide a statement both acknowledging it has considered the bases for the requested relief and briefly explaining the reasons the agency has declined to promulgate the requested regulations. 5 U.S.C. § 555(e); 5 U.S.C. § 706(2).

17

70.     TVA's May 21, 2020 letter fails to address the bases for Petitioners' Rulemaking Petition. TVA's Letter fails to acknowledge the lobbying and other advocacy activities of third-party groups that TVA financially supports. TVA's Letter further fails to address whether TVA's support for groups engaged in these advocacy activities in consistent with TVA's statutory mission. And finally, TVA's Letter fails to address how compelling TVA ratepayers to financially support these third-party groups is consistent TVA ratepayers' First Amendment rights.

71.     By failing to meaningfully respond to the Petition, TVA's May 21, 2020 Letter is arbitrary and capricious or contrary to law in violation of the APA. 5 U.S.C. § 706(2).

72.     These violations are injuring Plaintiffs in the manner described in Paragraphs 10-21 above.

## SECOND CLAIM FOR RELIEF
(unreasonably delayed agency action)

73.     Plaintiffs hereby incorporate by reference Paragraphs 1-67 above.

74.     The APA requires an agency to conclude a matter presented to it within a reasonable time. 5 U.S.C. § 555(b).

75.     As of the date of this filing, TVA has neither granted the Petition, nor informed Petitioners that the Petition is denied.

76.     TVA's delay in resolving the matters raised in the Petition constitutes agency action unreasonably delayed or unlawfully withheld in violation of the APA. 5 U.S.C. § 555(b); 5 U.S.C. § 706(1).

77.     These violations are injuring Plaintiffs in the manner described in Paragraphs 10-21 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      declare that TVA has violated the APA;

2.      direct TVA to provide a meaningful response to the Rulemaking Petition within thirty (30) days;

3.      retain jurisdiction of this matter until TVA has come into compliance with the APA;

4.      award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

5.     grant Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED: September 9, 2021

*/s/ Rachel L. Wolf*
Rachel L. Wolf
BPR 026034
Law Office of Rachel Wolf
706 Walnut Street, Suite 401
Knoxville, TN 37902
(865) 325-9653
Rlwolf.esq@gmail.com

*/s/ Howard M. Crystal*
Howard M. Crystal
D.C. Bar No. 446189
Center for Biological Diversity
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
(202) 809-6926
hcrystal@biologicaldiversity.org
(*Pro hac vice applicant*)

*/s/ Anchun Jean Su*
Anchun Jean Su
D.C. Bar No. CA285167
Center for Biological Diversity
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
(202) 809-6926
jsu@biologicaldiversity.org
(*Pro hac vice applicant*)

*Counsel for Plaintiffs*